# EXHIBIT A

1 of 100 DOCUMENTS

U.S. Treaties on LEXIS

CANADA

TREATY WITH CANADA ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

TREATY DOC. 100-14

*1985 U.S.T. LEXIS 230*

March 18, 1985, Date-Signed

**STATUS:**
[*1] PENDING: February 22, 1988. Treaty was read the first time, and together with the accompanying papers, referred to the Committee on Foreign Relations and ordered to be printed for the use of the Senate

MESSAGE FROM THE PRESIDENT OF THE UNITED STATES

TRANSMITTING THE TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF CANADA ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS, WITH ANNEX, SIGNED AT QUEBEC CITY ON MARCH 18, 1985

**TEXT:**
100TH CONGRESS

SENATE

**LETTER OF TRANSMITTAL**

THE WHITE HOUSE, *February 22, 1988.*
*To the Senate of the United States:*

With a view to receiving the advice and consent of the Senate to ratification, I transmit herewith the Treaty between the Government of the United States of America and the Government of Canada on Mutual Legal Assistance in Criminal Matters, with Annex, signed at Quebec City on March 18, 1985. I transmit also, for the information of the Senate, the report of the Department of State with respect to the Treaty.

The Treaty is one of a series of modern mutual legal assistance treaties being negotiated by the United States in order to counter more effectively criminal activities. The Treaty should be an effective [*2] tool to prosecute a wide variety of modern criminals including members of drug cartels, "white-collar criminals," and terrorists. The Treaty is self-executing and utilizes existing statutory authority.

The Treaty provides for a broad range of cooperation in criminal matters. Mutual assistance available under the treaty includes: (1) the taking of testimony or statements of witnesses; (2) the provision of documents, records and evidence; (3) the execution of requests for searches and seizures; (4) the serving of documents; and (5) the provision of assistance in proceedings relating to the forfeiture of the proceeds of crime, restitution to the victims of crime, and the collection of fines imposed as a sentence in a criminal prosecution.

I recommend that the Senate give early and favorable consideration to the Treaty and give its advice and consent to ratification.

RONALD REAGAN.

**LETTER OF SUBMITTAL**

DEPARTMENT OF STATE, *Washington, February 11, 1988.*

The PRESIDENT,
*The White House.*

THE PRESIDENT: I have the honor to submit to you the Treaty between the Government of the United States of America and the Government of Canada on Mutual Legal Assistance in Criminal Matters, [*3] with Annex (the "Treaty"), signed at Quebec City on March 18, 1985. I recommend that the Treaty be transmitted to the Senate for its advice and consent to ratification.

The Treaty covers mutual legal assistance in criminal matters. In recent years, similar bilateral treaties have entered into force with Italy, the Netherlands, Switzerland and Turkey; and others have been concluded (but not yet entered into force) with Colombia, Morocco, Mexico, Thailand, Belgium, the Bahamas and the United Kingdom on behalf of the Cayman Islands. The Treaty contains many provisions similar to those in the other treaties as well as some innovations.

The Treaty will not require further implementing legislation and will utilize the existing authority of the Federal courts, particularly *28 U.S.C. 1782.*

Article I contains the necessary definitions. It defines a "request" under the Treaty and provides for a Central Authority in each State, which is responsible for complying with requests made by a Competent Authority or transmitting them to the Competent Authorities to do so. For the United States, the Attorney General or officials designated by him will be the Central [*4] Authority. For Canada, the Minister of Justice or officials designated by him will be the Central Authority. The Competent Authorities for both countries shall be law enforcement authorities with responsibility related to the investigation and prosecution of offenses. The article defines an offence within the scope of the Treaty, for the United States, as felonies and misdemeanors other than petty offenses, and for Canada, as any offense that may be prosecuted upon indictment or an offense created by the Legislature of a Province in a category specified in the Annex. The Annex states that the term offence includes securities, wildlife protection, environmental protection and consumer protection offences under the law of Canada or the United States. Article I also defines the "public interest" as "any substantial interest related to national security or other essential public policy."

Article II provides for assistance in the "investigation, prosecution and suppression of offences." The Treaty thereby provides for assistance at the investigative stage (such as grand jury proceedings), as well as after formal charges have been filed. Assistance under the Treaty will include: taking [*5] testimony or statements of persons; provision of documents records and evidence; executing requests for searches and seizures; obtaining of witness testimony; and other forms of assistance. The article explicitly states that it is not intended to create rights in private parties either to gather evidence or secure other assistance or to suppress or exclude in civil or ciminal proceedings evidence obtained under the Treaty.

Article III provides that the parties may provide each other assistance pursuant to any other agreements, arrangements or practices, and, in exceptional cases, pursuant to the Treaty, provide assistance in respect of illegal acts that do not constitute offenses as defined in the Treaty.

Article IV states that when a party seeks documents, records or other articles of evidence known to be located in the territory of the other party, except when assistance is sought pursuant to other arrangements, agreements or practices, it shall request assistance under the Treaty. The parties shall consult in the event of the denial of a request or delay in its execution that jeopardizes successful completion of an investigation or prosecution. Unless otherwise agreed, at the end [*6] of 30 days after they were requested, consultations shall be deemed to have terminated and the parties to have fulfilled their obligations under this article.

Article V specifies the limited bases under the Treaty in which assistance may be denied by the Requested State. These bases are when the request is not in conformity with the Treaty or when execution of the request is contrary to the Requested State's "public interest," as determined by its Central Authority. The Requested State may postpone execution of a request if its execution would interfere with an ongoing investigation or prosecution. This article also provides that, before the Central Authority of the Requested State refuses a request, it should try to determine whether there is a way to render the assistance, subject to specified terms and conditions. If the Requesting State accepts the assistance subject to limitations, it must comply with those limitations.

Article VI provides that requests shall be made directly from one Central Authority to the other, and shall contain the information required by the Requested State to execute the request, including but not limited to, the subject matter and the nature of the investigation [*7] or proceeding to which the request relates, a description of the evidence, infor-

mation or other assistance sought, and the purpose for which it is sought. It provides that when use of compulsory process is required in the Requested State, requests shall be made in writing, except that in urgent circumstances requests may be made orally, but they must be confirmed in writing "forthwith." The article provides that the Requested State shall use its "best efforts" to keep confidential a request and its contents, except when otherwise authorized.

Article VII obligates each party to execute requests promptly and, to the extent not prohibited by its law, in accordance with the directions of the Requesting State. It also provides that the courts of the Requested State shall have authority to issue all orders necessary to execute a request.

Article VIII provides that the Requested State shall pay all ordinary costs relating to the execution of the request within its territory, except for the lawful fees of expert witnesses, the travel and incidental expenses of witnesses travelling to that State, and for translation and transcription expenses. The article also provides for consultation when [*8] expenses of an extraordinary nature are required to execute a request.

Article IX authorizes the Requested State, after consultation, to require that information or evidence furnished to the Requesting State be kept confidential or disclosed or used only subject to terms or conditions it may specify. Moreover, absent the prior consent of the Requested State, it restricts the disclosure or use of any information or evidence obtained under the Treaty to the investigation, prosecution or suppression of criminal offenses stated in the request. However, once the Requested State has consented to disclosure or has become public, the Requesting State may use the information for any purpose.

Article X obligates the parties to make best efforts to ascertain the location and identity of persons specified in the request.

Article XI creates an obligation on the part of the Requested State to serve any legal document transmitted by the Central Authority of the Requesting State. The Requesting State must transmit a document relating to a response or appearance in the Requesting State within a reasonable time before the scheduled response or appearance. A request for the service of a document relating [*9] to the appearance of a person in the Requesting State must include such notice as the Central Authority in the Requesting State is reasonably able to provide of outstanding warrants or other judicial orders in criminal matters against the person to be served.

Article XII provides that the Requested State may compel the taking of testimony or production of documents for the Requesting State by means available under and in accordance with the Requested State's laws. It also provides that every person whose attendance is required for the purpose of giving testimony under the article is entitled to the fees and allowances provided for by the laws of the Requested State.

Article XIII states that the Requested State shall provide the Requesting State with copies of publicly available records of government departments and agencies and may provide any other record or information in the possession of a government office or agency to the same extent and under the same conditions as it would be available to the Requested State's own law enforcement or judicial authorities.

Article XIV provides for the certification and authentication of documents and records in any manner required by the Requesting [*10] State or in any other mutually agreeable manner.

Article XV provides that the Requested State shall transfer a person in its custody to the Requesting State, for purposes under the Treaty, unless the Requested State has a reasonable basis to object or the person in custody does not consent. The Requesting State must keep that person in custody at all times and return that person immediately after the execution of the request.

Article XVI establishes a formal procedure for handling requests for the search and seizure of objects located in the Requested State for use as evidence in the Requesting State.

Article XVII requires that one Central Authority notify the other when it believes the proceeds of a criminal offense are in the territory of the other State. In addition, it provides that, to the extent permitted by their respective laws, the parties shall assist each other in proceedings relating to the forfeiture of proceeds, restitution to victims of crimes and the collection of fines imposed as a sentence for an offense.

Article XVIII provides that the parties shall consult periodically on the implementation of the Treaty and on developing other specific agreements or arrangements [*11] on mutual legal assistance.

Article XIX provides that the treaty shall enter into force on the date of the exchange of the instruments of ratification.

Article XX establishes termination procedures.

The Department of Justice joins the Department of State in favoring approval of this Treaty by the Senate as soon as possible.

Respectfully submitted,

GEORGE P. SHULTZ.

TREATY BETWEEN THE GOVERNMENT OF THE UNITED STATES OF AMERICA AND THE GOVERNMENT OF CANADA ON MUTUAL LEGAL ASSISTANCE IN CRIMINAL MATTERS

The Government of the United States of America and the Government of Canada,

Desiring to improve the effectiveness of both countries in the investigation, prosecution and suppression of crime through cooperation and mutual assistance in law enforcement matters,

Have agreed as follows:

ARTICLE I

*Definitions*

For the purposes of this Treaty:

"Central Authority" means--

(a) for Canada, the Minister of Justice or officials designated by him;

(b) for the United States of America, the Attorney General or officials designated by him;

"Competent Authority" means any law enforcement authority with responsibility for matters related to the investigation or prosecution of offenses;

"Offence" [*12] means--

(a) for Canada, an offense created by a law of Parliament that may be prosecuted upon indictment, or an offence created by the Legislature of a Province specified in the Annex;

(b) for the United States, an offence for which the statutory penalty is a term of imprisonment of one year or more, or an offence specified in the Annex;

"Public Interest" means any substantial interest related to national security or other essential public policy;

"Request" means a request made under this Treaty.

ARTICLE II

*Scope of Application*

1. The Parties shall provide, in accordance with the provisions of this Treaty, mutual legal assistance in all matters relating to the investigation, prosecution and suppression of offences.

2. Assistance shall include:

(a) examining objects and sites;
(b) exchanging information and objects;
(c) locating or identifying persons;
(d) serving documents;
(e) taking the evidence of persons;
(f) providing documents and records;
(g) transferring persons in custody;
(h) executing requests for searches and seizures.

3. Assistance shall be provided without regard to whether the conduct under investigation or prosecution in the Requesting State constitutes [*13] an offence or may be prosecuted by the Requested State.

4. This Treaty is intended solely for mutual legal assistance between the Parties. The provisions of this Treaty shall not give rise to a right on the part of a private party to obtain, suppress or exclude any evidence or to impede the execution of a request.

ARTICLE III

*Other Assistance*

1. The Parties, including their competent authorities, may provide assistance pursuant to other agreements, arrangements or practices.

2. The Central Authorities may agree, in exceptional circumstances, to provide assistance pursuant to this Treaty in respect of illegal acts that do not constitute an offence within the definition of offence in Article I.

ARTICLE IV

*Obligation To Request Assistance*

1. A Party seeking to obtain documents, records or other articles known to be located in the territory of the other Party shall request assistance pursuant to the provisions of this Treaty, except as otherwise agreed pursuant to Article III(1).

2. Where denial of a request or delay in its execution may jeopardize successful completion of an investigation or prosecution, the Parties shall promptly consult, at the instance of either Party, to [*14] consider alternative means of assistance.

3. Unless the Parties otherwise agree, the consultations shall be considered terminated 30 days after they have been requested, and the Parties' obligations under this Article shall then be deemed to have been fulfilled.

ARTICLE V

*Limitations on Compliance*

1. The Requested State may deny assistance to the extent that--

(a) the request is not made in conformity with the provisions of this Treaty; or

(b) execution of the request is contrary to its public interest, as determined by its Central Authority.

2. The Requested State may postpone assistance if execution of the request would interfere with an ongoing investigation or prosecution in the Requested State.

3. Before denying or postponing assistance pursuant to this Article, the Requested State, through its Central Authority--

(a) shall promptly inform the Requesting State of the reason for considering denial or postponement; and

(b) shall consult with the Requesting State to determine whether assistance may be given subject to such terms and conditions as the Requested State deems necessary.

4. If the Requesting State accepts assistance subject to the terms and conditions referred [*15] to in paragraph 3(b), it shall comply with said terms and conditions.

ARTICLE VI

*Requests*

1. Requests shall be made by the Central Authority of the Requesting State directly to the Central Authority of the Requested State.

2. Requests shall be made in writing where compulsory process is required in the Requested State or where otherwise required by the Requested State. In urgent circumstances, such requests may be made orally, but shall be confirmed in writing forthwith.

3. A request shall contain such information as the Requested State requires to execute the request, including--

    (a) the name of the competent authority conducting the investigation or proceeding to which the request relates;

    (b) the subject matter and nature of the investigation or proceeding to which the request relates;

    (c) a description of the evidence, information or other assistance sought;

    (d) the purpose for which the evidence, information or other assistance is sought, and any time limitations relevant thereto; and

    (e) requirements for confidentiality.

4. The Courts of the Requesting State shall be authorized to order lawful disclosure of such information as is necessary to enable the Requested State [*16] to execute the request.

5. The Requested State shall use its best efforts to keep confidential a request and its contents except when otherwise authorized by the Requesting State.

ARTICLE VII

*Execution of Requests*

1. The Central Authority of the Requested State shall promptly execute the request or, when appropriate, transmit it to the competent authorities, who shall make best efforts to execute the request. The Courts of the Requested State shall have jurisdiction to issue subpoenas, search warrants or other orders necessary to execute the request.

2. A request shall be executed in accordance with the law of the Requested State and, to the extent not prohibited by the law of the Requested State, in accordance with the directions stated in the request.

ARTICLE VIII

*Costs*

1. The Requested State shall assume all ordinary expenses of executing a request within its boundaries, except--

    (a) fees of experts;

    (b) expenses of translation and transcription; and

    (c) travel and incidental expenses of persons travelling to the Requested State to attend the execution of a request.

2. The Requesting State shall assume all ordinary expenses required to present evidence from the Requested [*17] State in the Requesting State, including--

    (a) travel and incidental expenses of witnesses travelling to the Requesting State, including those of accompanying officials; and

    (b) fees of experts.

3. If during the execution of the request it becomes apparent that expenses of an extraordinary nature are required to fulfill the request, the Parties shall consult to determine the terms and conditions under which the execution of the request may continue.

4. The Parties shall agree, pursuant to Article XVIII, on practical measures as appropriate for the reporting and payment of costs in conformity with this Article.

ARTICLE IX

*Limitations of Use*

1. The Central Authority of the Requested State may require, after consultation with the Central Authority of the Requesting State, that information or evidence furnished be kept confidential or be disclosed or used only subject to terms and conditions it may specify.

2. The Requesting State shall not disclose or use information or evidence furnished for purposes other than those stated in the request without the prior consent of the Central Authority of the Requested State.

3. Information or evidence made public in the Requesting State [*18] in accordance with paragraph 2 may be used for any purpose.

ARTICLE X

*Location or Identity of Persons*

The competent authorities of the Requested State shall make best efforts to ascertain the location and identity of persons specified in the request.

ARTICLE XI

*Service of Documents*

1. The Requested State shall serve any document transmitted to it for the purpose of service.

2. The Requesting State shall transmit a request for the service of a document pertaining to a response or appearance in the Requesting State within a reasonable time before the scheduled response or appearance.

3. A request for the service of a document pertaining to an appearance in the Requesting State shall include such notice as the Central Authority of the Requesting State is reasonably able to provide of outstanding warrants or other judicial orders in criminal matters against the person to be served.

4. The Requested State shall return a proof of service in the manner required by the Requesting State or in any manner agreed upon pursuant to Article XVIII.

ARTICLE XII

*Taking of Evidence in the Requested State*

1. A person requested to testify and produce documents, records or other articles in [*19] the Requested State may be compelled by subpoena or order to appear and testify and produce such documents, records and other articles, in accordance with the requirements of the law of the Requested State.

2. Every person whose attendance is required for the purpose of giving testimony under this Article is entitled to such fees and allowances as may be provided for by the law of the Requested State.

ARTICLE XIII

*Government Documents and Records*

1. The Requested State shall provide copies of publicly available documents and records of government departments and agencies.

2. The Requested State may provide copies of any document, record or information in the possession of a government department or agency, but not publicly available, to the same extent and under the same conditions as would be available to its own law enforcement and judicial authorities.

ARTICLE XIV

*Certification and Authentication*

1. Copies of documents and records provided under Article XII or Article XIII shall be certified or authenticated in the manner required by the Requesting State or in any manner agreed upon pursuant to Article XVIII.

2. No document or record otherwise admissible in evidence in the [*20] Requesting State, certified or authenticated under paragraph 1, shall require further certification or authentication.

ARTICLE XV

*Transfer of Persons in Custody*

1. A person in custody in the Requested State whose presence is requested in the Requesting State for the purposes of this Treaty shall be transferred from the Requested State to the Requesting State for that purpose, provided the person in custody consents and the Requested State has no reasonable basis to deny the request.

2. The Requesting State shall have the authority and duty to keep the person in custody at all times and return the person to the custody of the Requested State immediately after the execution of the request.

ARTICLE XVI

*Search and Seizure*

1. A request for search and seizure shall be executed in accordance with the requirements of the law of the Requested State.

2. The competent authority that has executed a request for search and seizure shall provide such certifications as may be required by the Requesting State concerning, but not limited to, the circumstances of the seizure, identity of the item seized and integrity of its condition, and continuity of possession thereof.

3. Such certifications [*21] may be admissible in evidence in a judicial proceeding in the Requesting State as proof of the truth of the matters certified therein, in accordance with the law of the Requesting State.

4. No item seized shall be provided to the Requesting State until that State has agreed to such terms and conditions as may be required by the Requested State to protect third party interests in the item to be transferred.

ARTICLE XVII

*Proceeds of Crime*

1. The Central Authority of either Party shall notify the Central Authority of the other Party of proceeds of crime believed to be located in the territory of the other Party.

2. The Parties shall assist each other to the extent permitted by their respective laws in proceedings related to the forfeiture of the proceeds of crime, restitution to the victims of crime, and the collection of fines imposed as a sentence in a criminal prosecution.

ARTICLE XVIII

*Improvement of Assistance*

1. The Parties agree to consult as appropriate to develop other specific agreements or arrangements, formal or informal, on mutual legal assistance.

2. The Parties may agree on such practical measures as may be necessary to facilitate the implementation of this Treaty. [*22]

ARTICLE XIX

*Ratification and Entry Into Force*

1. This Treaty shall be ratified, and the instruments of ratification shall be exchanged at Washington, D.C., as soon as possible.

2. This Treaty shall enter into force upon the exchange of instruments of ratification.

ARTICLE XX

*Termination*

Either Party may terminate this Treaty by giving written notice to the other Party at any time. Termination shall become effective six months after receipt of such notice.

*Annex*

The definition of offence includes offences created by the Legislature of a Province of Canada or offences under the law of the United States in the following categories:

(1) securities;

(2) wildlife protection;
(3) environmental protection; and
(4) consumer protection.

IN WITNESS WHEREOF the undersigned, being duly authorized thereto by their respective Governments, have signed this Treaty.

DONE in duplicate, in the English and French languages, each language version being equally authentic, at Quebec City, this 18th day of March, 1985.

RONALD REAGAN,

For the Government of the United States of America.

BRIAN MULRONEY,

For the Government of Canada.