**IN THE UNITED STATES DISTRICT COURT**

**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Criminal Action No. 17-63-LPS |
| | : | |
| JERRY JINDONG XU, | : | |
| | : | |
| Defendant. | : | |

## MEMORANDUM IN RESPONSE TO THE DEFENDANT'S OMNIBUS MOTION TO DISMISS THE INDICTMENT

For approximately one year prior to leaving his employment with The Chemours Company ("Chemours"), Jerry Jindong XU (the "defendant") systematically stole—through surreptitious action and outright lies to colleagues—dozens of trade secret files about the expansion of Chemours' highly lucrative sodium cyanide business.  Armed with this information and while still employed by Chemours, the defendant established an illicit side company designed to solicit Chinese-based investors to enter the Canadian sodium cyanide market in direct competition against Chemours—a plan he continued through the time of his arrest.  For his conduct, a District of Delaware grand jury indicted the defendant for conspiring to commit theft of trade secrets, in violation of 18 U.S.C. §§ 1832(a)(2) and (a)(5).  The defendant now moves to dismiss the Indictment through an Omnibus Motion, which includes three arguments:   one written by defense counsel, and two crafted by the defendant *pro se* (hereinafter the "Motion").  D.I. 50, p. 1, 10.  All three should be denied.

In the only argument advanced by counsel, the defendant claims that there is an insufficient nexus between his criminal conduct and the United States, and therefore the Court lacks

jurisdiction over the charged offense.[1]   This argument fails.   When an individual conspires to steal trade secrets abroad, Congress authorizes the prosecution of that extraterritorial conduct when at least one "act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837.   As the defendant acknowledges, the Indictment satisfies this requirement.   To the extent that the defendant asserts that more is necessary to satisfy due process concerns, he is wrong. Although one other court of appeal has concluded that in order to apply a federal criminal statute to a defendant's actions abroad "'consistently with due process, there must be a sufficient nexus between the defendant and the United States,'" the Third Circuit has expressly declined to adopt that standard.   *See United States v. Hidalgo*, 993 F.2d 1052, 1056 (3d Cir. 1993) (quoting and declining to follow *United States v. Davis*, 905 F.2d 245 (9th Cir. 1990)).   And even if the Third Circuit had concluded otherwise, a sufficient nexus exists between this country and the defendant's actions.   Indeed, the defendant's actions were designed to victimize a company based here, and as part of his scheme, the defendant both emailed an employee in Delaware and traveled to a Chemours facility in Memphis, Tennessee in order to steal confidential and proprietary information.

The defendant, acting *pro se*, raises two additional arguments.   At the outset, the Court should dismiss them as inappropriately raised, because the defendant is represented by counsel.[2]

---

[1] This claim is the same as that advanced by the defendant *pro se* in "Claim 3" of the Motion: that "18 U.S.C. 1832 fails to overcome the presumption against extraterritorial application . . . ." D.I. 50, p. 12.

[2] The government understands from the March 14, 2018, teleconference that the defendant wishes to terminate his relationship with current counsel and seek new representation.   As of the date of the Motion's filing and this Response, however, the defendant was and remains represented.

*United States v. Xiang Li*,  No. 10-112-LPS-1, 2012 WL 5379102 at *1 (D. Del. Oct. 31, 2012) (Stark, J.) (denying *pro se* motion to dismiss the indictment because defendant had counsel and there is no "right to a 'hybrid representation.'") (citation omitted).  But if the Court elects to consider them, they lack merit.

First, the defendant attempts to invoke the "void for vagueness" doctrine, which stands for the rule "[a] conviction fails to comport with due process if *the statute* under which it is obtained fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement."  D.I. 50, pp. 13-16; *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18 (2010) (emphasis added).  In so doing, however, the defendant does not argue that the applicable statute in this case is vague. Rather, he claims that a document provided to him by Chemours—namely, a Confidentiality Agreement—did not provide fair notice that his actions were criminal.[3]  D.I. 50, p. 14.  Because the defendant does not set forth any argument with regard to the statute itself, his void-for-vagueness claim fails *ab initio.*

Second, the defendant argues that the Court should dismiss the Indictment based on principles of international comity.  D.I. 50, pp. 16-19.  In so doing, he relies upon a choice-of-law provision in his employment contract and attempts to invoke an abstention doctrine applicable in the context of civil antitrust cases.  D.I. 50, p. 16-19 (citing *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1297-98 (3d Cir. 1979)).  This argument fails.  Even if the

---

[3]  The Motion references its Exhibit "A" as a non-disclosure agreement.  *See, e.g.*, D.I. 50, p. 12. The document is titled "EMPLOYEE CONFIDENTIAL AND PROPRIETY INFORMATION AGREEMENT" so the United States refers to it herein as the "Confidentiality Agreement."  D.I. 50, defendant's Exhibit "A."

Court were to assume that it had discretion to decline jurisdiction in a criminal matter, it should not do so.  Such cases are of "great importance to the United States," and a court's refusal to exercise jurisdiction would be inappropriate.  *United States v. Brodie*, 174 F. Supp. 2d 294, 306 (E.D. Pa. 2001).

## BACKGROUND

Chemours is a Delaware-based corporation formed in 2015 when The DuPont Corporation ("DuPont") separated its performance chemicals business line from its other business.  Chemours is a publicly-traded company with its corporate headquarters in Wilmington, Delaware and regional offices throughout the world.  Chemours' Delaware, Memphis, and Canada offices were cited throughout the instant Indictment.  *See, e.g.*, D.I. 14, ¶¶ 1-8.[4]

At all times material to the Indictment, Chemours was the world's largest producer of solid sodium cyanide.  *Id.* at ¶ 2.  Chemours' sodium cyanide products are primarily used in industrial mining operations for gold, diamonds, and other precious metals.  They are a lucrative part of Chemours' overall business, generating hundreds of millions of dollars in yearly sales revenue. *Id.*  Chemours conducted the research and development for their cyanide-based products, including sodium cyanide, at a research and development facility in Wilmington, Delaware. Chemours manufactured four cyanide-based products at its primary facility in Memphis, Tennessee.

From 2011 through 2017, DuPont/Chemours conducted three projects relevant to the Indictment: Project 1 analyzed the factors necessary to create a profitable sodium-cyanide plant in Canada; Project 2 was designed to improve the supply chain design for delivering sodium cyanide

---

[4] Unless otherwise noted, all facts herein were included in the Indictment.

to eastern Canada, and it included a planned facility; and Project 3's purpose was to design and build an additional sodium-cyanide plant using new technology.[5]   *Id.* at ¶¶ 4-6.   As detailed in the Indictment, DuPont/Chemours took reasonable steps to protect trade secret and confidential and proprietary information related to those three projects and any others.   *Id.* at ¶ 7.   For example, they required employees to sign confidentiality agreements upon hiring and termination statements when leaving, which certified that the employee had returned all sensitive information; they conducted periodic training on recognizing and protecting trade secrets; and they restricted access to their facilities in the United States, Mexico, and Canada by requiring employees to use access badges.   *Id.*   At some facilities, like the Memphis sodium cyanide plant, Chemours prohibited visitors—including its own employees—from possessing a camera or a cell phone capable of recording information unless the employee had a permit, and required individuals to receive express permission before removing any property.   *Id.*

The defendant, Chinese-born and now a Canadian citizen, worked in marketing for DuPont-China's Chemical Solutions Division from 2004 through 2011 before moving to Canada where he continued working for DuPont/Chemours until June 20, 2016.   *Id.* at ¶¶ 8-9.   The defendant's responsibilities primarily involved marketing cyanide products while in Canada.   As a condition of his employment at DuPont/Chemours' regional office in Canada, the defendant signed a Confidentiality Agreement that indicated he would "not disclose or use at any time either during or subsequent to employment with DuPont any Confidential Information except as required in Employee's duties to DuPont or with DuPont's prior written consent."   *Id.* at ¶ 8, *see also* D.I.

---

[5] The project names are redacted in the Indictment because of the sensitive and, in some cases, ongoing nature of the projects.

50, Defendant's Exhibit "A."   Like all employees, the defendant was trained on identifying and caring for trade secret and other confidential and proprietary information.   D.I. 14, ¶ 7.

On or about June 13, 2016, Chemours notified the defendant that his employment would be terminated in seven (7) days.[6]   On June 20, 2016, the defendant signed an Employee Termination Statement, in which he certified that he had returned all "drawings, blueprints, manuals, letters, notes, notebooks, reports and all other material of a secret or confidential nature relating to [Chemours'] business, which were in his/her possession or under his/her control."   *Id.* at ¶ 11.   He further certified that he was prohibited from "us[ing] or divulg[ing] at any time secret or confidential information of [Chemours] without its written consent."   *Id.*

From approximately June 23, 2015, until August 4, 2016, the defendant systematically stole trade secret and other confidential and proprietary information, regarding sodium cyanide, from Chemours.[7]   The stealing, detailed in forty-eight (48) paragraphs of overt acts in the Indictment, took several forms.   For example, the defendant:

- stole files from his work-issued computers and transmitted them to external hard drives, thumb drives, or to several personal email addresses belonging to himself and co-conspirators (*see, e.g.*, D.I. 14, ¶¶ 43-46);

- induced colleagues to send him confidential documents to which he was not privy, including lying to one about being asked to review Project 1, and telling another he

---

[6] According to Chemours, the defendant was terminated for poor performance—though they initially told him that he was a victim of downsizing.   They did not learn the scope of his criminal activity until after his termination.

[7] Whereas it later became clear that the conspiracy continued far beyond August 4, 2016, these are the dates in the Indictment and therefore the only dates relevant to the instant challenge.

needed a password for a DuPont/Chemours document he obtained from an unindicted co-conspirator (*id.* at ¶¶ 19, 27-28);

- misled a colleague in the Wilmington, Delaware office to send him trade secret and confidential and proprietary information regarding costs of necessary materials for producing sodium cyanide (*id.* at ¶ 29);

- "checked with" Chemours colleagues in order to obtain information regarding sodium cyanide shipping costs which he then shared with his co-conspirator, saying, "We should stand substantial freight advantage as compared with Chemours . . ." (*id.* at ¶ 52);

- misled Chemours colleagues at the Memphis sodium cyanide plant in order to get himself invited to a meeting where he did not belong; then he asked for a personal tour of the plant; during which he surreptitiously took five (5) photographs of the plant's confidential and proprietary Project 3 schematics—shortly after receiving training on the prohibition of pictures, phones, and recording devices—and then emailed the photographs from his personal email account to an email account he operated in the name of his side business (*id.* at ¶¶ 54-58); and

- in his final week at Chemours—from the date he was notified of his termination, June 13, to his final day, June 20—the defendant outright copied numerous Chemours documents to removable drives and attached documents to emails sent to his personal email account (*id.* at ¶¶ 60-62).

*See generally*, D.I. 14, ¶¶ 19-67.   The defendant also traveled to China, purportedly on a personal vacation, but while there he accessed sensitive information on his Chemours-issued computer;

corresponded with his co-conspirator about the costs of building their own sodium cyanide plant, and asked "how much would it [be] worth?"   *Id.* at ¶¶ 31-38.   He met and maintained contact with several potential investors in China, discussing, in his words, "the proposed sodium cyanide operations" and his frustration that he wanted to execute this sodium cyanide factory plan for himself, "not to slave away at this only to benefit someone else."   *Id.* at ¶ 21, 26; *see, e.g.*, *id.* at ¶¶ 20-26, 48.

On August 21, 2017, a criminal complaint was executed in the District of Delaware, charging the defendant with conspiring to commit theft of trade secrets in violation of 18 U.S.C. § 1832(a)(5).   The defendant was arrested for this offense the next day in the Northern District of New York.   On September 5, 2017, a grand jury in the District of Delaware returned the instant Indictment charging the defendant with conspiring to commit theft of trade secrets, in violation of 18 U.S.C. §§ 1832(a)(2) and (a)(5).

The defendant filed his Motion on January 26, 2018, which included several claims.   D.I. 50.   The parties jointly moved, and this Court subsequently ordered, that the United States need only respond to "Motion to Dismiss – Jurisdiction" and the Companion Motion—staying the remaining motions to dismiss, such as motions to suppress statements and physical evidence, pending resolution of the initial claims.   D.I. 53.

## LEGAL STANDARD

Motions to dismiss an indictment are governed by Rule 12 of the Federal Rules of Criminal Procedure.   Fed. R. Crim. P. 12.   A Rule 12(b)(3)(B) motion is a "challenge to the sufficiency of the indictment" and is "decided based on the facts alleged within the four corners of the indictment, not the evidence outside of it."   *Vitillo*, 490 F.3d at 321.   A court's review is limited,

however, in that the allegations in the indictment must be "accepted as entirely true," because the court's analysis is "geared only towards ensuring that legally deficient charges do not go to a jury." *United States v. Bergrin*, 650 F.3d 257, 268 (3d Cir. 2011).   The standard is the same for Rule 12(b)(2) motions at this stage.   *See*, *e.g.*, *United States v. Gardenhire*, 2017 WL 736912, at *2 (W.D. Pa. Feb. 24, 2017) (setting forth standard for Rule 12(b)(2) motion), *see also United States v. Manganas*, No. 1:16-CR-0209, 2017 WL 2547310, at *2 (M.D. Pa. June 13, 2017) (analogizing pretrial Rule 12(b)(2) and (b)(3) as attacks on the sufficiency of an indictment), *United States v. Segura*, No. 14-286, 2016 WL 1623182, at *2 (W.D. Pa. Apr. 25, 2016) (same).

The legal standard for an indictment's sufficiency under a Rule 12 challenge is straightforward: it must be a "plain, concise, and definite written statement of the essential facts constituting the offense charged."   Fed. R. Crim. P. 7(c)(1).   That Rule was designed to create a simple, non-technical procedure for charging criminal defendants.   *United States v. Resendiz-Ponce*, 549 U.S. 102, 110 (2007).   An indictment is sufficient if it "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or conviction in the event of a subsequent prosecution."   *United States v. Vitillo*, 490 F.3d 314, 321 (3d Cir. 2007) (quoting *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989)); *see also United States v. Stock*, 728 F.3d 287, 292 (3d Cir. 2013).   In order to properly state an offense, the indictment also "must allege that the defendant performed acts which, if proven, constituted a violation of the law that he or she is charged with violating." *United States v. Al Hedaithy*, 392 F.3d 580, 589 (3d Cir. 2004) (quoting *United States v. Zauber*, 857 F.2d 137, 144 (3d Cir. 1988)).   A recitation of the statutory language and a factual orientation that specifies

the time period of the alleged offense satisfies all three elements.   *Stock*, 728 F.3d at 292.   "In short, detailed allegations are unnecessary."   *Id.*   (internal quotation marks omitted).

## ARGUMENT

### A.       This Court Has Jurisdiction Pursuant to 18 U.S.C. § 1837

"Traditionally, American courts have held that under American law, jurisdiction in criminal matters rests solely with the legislative and judicial branches of government of the state or country in which the crime is committed."   *United States v. Goldberg*, 830 F.2d 459, 462 (3d Cir. 1987) (internal citation and quotation marks omitted).   Exceptions exist, however, when Congress indicates a "contrary intent[.]"   *Asplundh Tree Expert Co. v. N.L.R.B.*, 365 F.3d 168, 173 (3d Cir. 2004); *see, e.g., E.E.O.C. v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991) ("Congress has the authority to enforce its laws beyond the territorial boundaries of the United States.").   One such example is the criminalization of the theft of trade secrets, codified via the Economic Espionage Act of 1996 ("EEA").   Pub. L. No. 104-294, 110 Stat. 3489 (1996) (codified at 18 U.S.C. §§ 1831-1839).

Congress' intent to afford extraterritorial jurisdiction to theft of trade secrets is clear.   In enacting the EEA's trade secret statutes, Congress unequivocally provided that their terms are applicable to foreign defendants where "an act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837(2).   "To rebut the general presumption against the extraterritoriality of U.S. criminal laws, *this section makes it clear that the Act is meant to apply to certain conduct occurring beyond U.S. borders*."   S.Rep. No. 104–359, at 17 (emphasis added). As the Third Circuit wrote in *United States v. Hsu*:

> The Senate Report includes an entire section entitled "Need for a Comprehensive Federal Law," and "underscore[s] the importance of developing a systematic

10

> approach to the problem of economic espionage." S.Rep. No. 104–359, at 11. The
> Report notes that "a Federal criminal statute will provide a comprehensive approach
> to [the theft of trade secrets]—*with clear extraterritoriality*, criminal forfeiture, and
> import-export sanction provisions."   *Id* at 12.

155 F.3d 189, 201 (3d Cir. 1998) (emphasis added).   Significantly, § 1837(2)'s extraterritoriality

provision requires "an act" in furtherance of the conspiracy to occur in the United States in order

to trigger jurisdiction.   Here, the Indictment included several such acts committed in the United

States "in furtherance of the conspiracy[,]" for example:   (1) emails the defendant sent into the

United States, and to Chemours employees in this District, that deceived individuals into sending

him documents that he subsequently stole; (2) emails into the United States to orchestrate his trip

to Memphis; (3) emails sent back to him from Chemours employees based in the United States;

and (4) the defendant's trip to Memphis during which he took and sent the pictures of the plant's

schematics.   D.I. 14, ¶¶ 29, 52, 54-58.   These are many more than the one act necessary to confer

jurisdiction pursuant to § 1837(2).   *See*, *e.g.*, *United States v. Nelson*, 852 F.2d 706, 713 (3d Cir.

1988) (holding that a single overt act by any member of the conspiracy is sufficient to satisfy this

element as long as the act was committed to further the conspiracy and tended towards that end).[8]

The defendant himself acknowledges that "two instances" of his conduct occurred in, or

were specifically directed at, the United States: emails inducing a Chemours employee in

Wilmington to send him trade secret information (Indictment at ¶ 29), and his visit to the Memphis

sodium cyanide plant during which the defendant took pictures of the plant's schematics

---

[8] If the Court's analysis were not limited to "the four corners of the indictment," *Vitillo*, 490 F.3d at 321, the United States would list many more acts that took place within these borders, including, among others: the defendant's (and his wife's) emails and telephone calls to companies based in the United States with whom he intended to use the information he stole against Chemours; and the defendant's use of email platforms to transfer and/or store stolen material, all of which are based in the United States.

(Indictment at ¶¶ 54-58).  D.I. 50 at 4.  Regarding the emails, the defendant asserts that "[i]t cannot be said that an act in furtherance of the offense occurred in the United States by the virtue of the defendant sending an email from Canada to the United States."  *Id.*  Regarding asking for a personal tour of the Memphis sodium cyanide plant, surreptitiously taking photographs of the plant's confidential and proprietary schematics (shortly after receiving training on a prohibition of pictures, phones, and recording devices) and then emailing the photographs from his personal email account to an email account he operated in the name of his side business, the defendant writes that they "cannot all be said to be in furtherance of the charged offense." *Id.* at 5.  Both of these characterizations ignore the plain language of the Indictment and the focus of the statute.

As explained above, the defendant's conduct—reaching into the United States in order to steal and do harm—is precisely the kind of "certain conduct occurring beyond U.S. borders" to which this law is "meant to apply[.]"  S.Rep. No. 104–359, at 17.  The nexus to the conspiracy, as is clear in the Indictment, is that the defendant was obtaining this information in furtherance of his ultimate goal of building a sodium cyanide plant.

With regard to the emails, the Indictment made clear that the defendant sent these emails to an employee in Delaware in order to obtain confidential information—here, costs of raw materials necessary for the production of sodium cyanide—and unlawfully use it for his own benefit.  D.I. 14 at ¶ 29.  It mattered not where the defendant sat when he sent those emails; rather, jurisdiction in American courts took hold when "an act in furtherance of the offense was committed in" Delaware.[9]  18 U.S.C. § 1837(2).

---

[9] The defendant's logic that a person is beyond the reach of the Court anytime s/he sits outside its borders is without support in the relevant statute, interpretative case law, or common sense.  Such a position would immunize anyone overseas who, for example, places a bomb on "any civil aircraft

The defendant's trip to Memphis is an even better example.   Therein, as part of his scheme, the defendant took secret pictures of confidential information while on American soil.   As detailed in the Indictment, the defendant misled Chemours colleagues in order to get himself invited to a meeting where he did not belong; asked for a personal tour of the plant; surreptitiously took five (5) photographs of the plant's Project 3 schematics—shortly after receiving training on the prohibition of pictures, phones, and recording devices—and then emailed the photographs from his personal email account to an email account he operated in the name of his side business.   D.I. 14, ¶¶ 54-58.   These were clear steps in furtherance of the defendant's unlawful scheme that he took while on American soil.

The defendant next claims that these overt acts, as well as the others set forth in the Indictment, fail to "establish a jurisdictional nexus that comports with Due Process."   D.I. 50, pp. 13-16.   This argument fails for two reasons.

*First*, the "jurisdictional nexus" doctrine that the defendant attempts to invoke here stems from the Ninth Circuit's opinion in *United States v. Davis*, 905 F.2d 245, 249 (9th Cir. 1990).   The Third Circuit, however, explicitly declined to follow *Davis* and its rationale.   *United States v. Martinez-Hidalgo*, 993 F.2d 1052, 1056 (3d Cir.1993);   *United States v. Bianchi*, No. CRIM. 06-19, 2007 WL 1521123, at *1 (E.D. Pa. May 22, 2007) ("The Third Circuit . . . has explicitly

---

used, operated, or employed in interstate, overseas, or foreign air commerce" (18 U.S.C. § 32); kidnaps the President (18 U.S.C. § 1751(b) and (k)); launders money via a financial transaction that occurs "in part in the United States" (18 U.S.C. § 1956(b)(2)); or transmits child pornography "intending that the visual depiction will be imported into the United States" (18 U.S.C. § 2260(b)). Economic espionage and trade secret theft are among hundreds of statutes on which Congress has provided for extraterritorial jurisdiction. *See Extraterritorial Application of American Criminal Law*, Congressional Research Service, p. 42-62 (Oct. 31, 2016), *available at* https://fas.org/sgp/crs/misc/94-166.pdf (last accessed March 4, 2018).

declined to follow the cases cited by Defendant.") (citing *Martinez-Hidalgo*).   Specifically, the Third Circuit stated that it "decline[d] to follow *Davis*" because it saw "nothing fundamentally unfair in applying . . . [a criminal law] extraterritorially without regard for a nexus between a defendant's conduct and the United States."   *Martinez-Hidalgo*, 993 F.2d at 1056.   *Second*, even if the Court were to assume otherwise, a sufficient nexus exists between the defendant's conduct and the United States to comport with principles of due process.   The "Due Process Clause" only requires "some minimal contact between a State and the regulated subject."   *United States v. Baston*, 818 F.3d 651, 669 (11th Cir. 2016) (citation and quotation omitted).   The conduct set forth in the Indictment more than meets this threshold.   Indeed, as discussed above, the defendant is charged with violating a statute that *requires* "an act in furtherance of the offense was committed in the United States." 18 U.S.C. § 1837(2).   And the Indictment sets forth *several* acts that were committed in the United States.   D.I. 14, ¶¶ 29, 52, 54-58.

Moreover, even if the defendant committed no acts in the United States, the Indictment would not run afoul of the Due Process clause.   At bottom, the defendant's scheme was designed to steal valuable trade secrets from Chemours.   Thus, the defendant's criminal actions were directed towards, and had an effect on, an American company.   This alone is sufficient.   *See*, *e.g., United States v. Goldberg*, 830 F.2d 459, 463-64 (3d Cir. 1987) (discussing the "need for a nation to protect against the injurious effect upon its citizens and upon commerce" as a proper rationale for the extraterritorial reach of a criminal statute) (citing cases).

### B.      The Defendant's Pro Se Arguments Should Be Denied Because They Are Improperly Raised and Lack Merit.

The defendant attempts to raise two arguments *pro se*, despite the fact that he has counsel. D.I. 50, pp. 13-20.   The Court should dismiss these claims as inappropriately raised.   *United*

*States v. Xiang Li*,  No. 10-112-LPS-1, 2012 WL 5379102 at *1 (D. Del. Oct. 31, 2012) (Stark, J.)

(denying *pro se* motion to dismiss the indictment because defendant had counsel and there is no

"right to a 'hybrid representation.'") (citation omitted).   Even if the Court were to consider them

on the merits, however, they would fail.

The defendant first claims that he did not believe that his actions were criminal because

Chemours failed "to give [him] fair notice that any violation of the terms of [the Confidentiality

Agreement] would subject him to criminal sanctions under united states (sic) trade secret laws"

and gave him "the impression that enforcement of [the Confidentiality Agreement] would be

construed and enforced under the laws and jurisdiction of Ontario . . . ."  D.I. 50, p.14.   The

defendant then argues that, pursuant to the Confidentiality Agreement, he was unaware that his

actions were criminal and his prosecution should be dismissed as void for vagueness.   *Id.* at pp.

13-14.   This argument fails for several reasons.

First, to successfully dismiss an indictment pursuant to a "void-for-vagueness" challenge,

the defendant must demonstrate that the underlying statute "fails to provide a person of ordinary

intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages

seriously discriminatory enforcement."   *Holder v. Humanitarian Law Project*, 561 U.S. 1, 18

(2010) (emphasis added).   The defendant makes no showing that the trade secret statute—or any

other portion of the EEA—meets this standard.   And it does not.   Second, the defendant's claim

relies upon portions of the Confidentiality Agreement that are not set forth in the Indictment; such

an argument is not properly raised through a pretrial, Rule 12 motion.   *Vitillo*, 490 F.3d at 32

(stating that a Rule 12(b)(3)(B) motion is a "challenge to the sufficiency of the indictment" and is

"decided based on the facts alleged within the four corners of the indictment, not the evidence

15

outside of it."). Third, at core, the defendant's argument is that he was ignorant of American criminal law. This is simply not a defense. *Lambert v. People of the State of California*, 355 U.S. 225, 228 (1957) ("The rule that 'ignorance of the law will not excuse' is deep in our law[.]"). (internal citation omitted).

The defendant next argues that, pursuant to a choice-of-law provision in his Confidentiality Agreement, the Court should dismiss the Indictment based on principles of international comity, citing *Mannington Mills, Inc. v. Congoleum Corp.*, 595 F.2d 1287, 1297-98 (3d Cir. 1979). In so doing, the defendant baldly asserts that "allow[ing] this prosecution, after Chemours was binded (sic) by those terms and its choice of law jurisdiction being Ontario, would undoubtedly cause international conflict with U.S. subsidiaries in other countries." D.I. 50, p. 12.

This argument, too, should fail.[10] The defendant provides no authority that would authorize the Court to take such action—particularly where Congress has expressly conferred extraterritorial jurisdiction and the executive branch utilized its prosecutorial discretion to bring a criminal case. *See United States v. Lewis*, 936 F. Supp. 1093, 1108-09 (D.R.I. 1996) (concluding that the application of an abstention doctrine would be "inappropriate" in a criminal case and citing cases); *see also United States v. Brodie*, 174 F. Supp. 2d 294, 306 (E.D. Pa. 2001) (recognizing but declining to address the argument that "international comity can never be a reason to dismiss

---

[10] A choice-of-law provision in an employment contract does not bind criminal jurisdiction. "The simple fact that [Chemours] *may* have brought a civil contract claim against Defendant[] does not immunize [his] conduct from criminal prosecution if that conduct meets the elements of the criminal statutes as well." *United States v. Ali*, 620 F.3d 1062, 1071 (9th Cir. 2010); *see also Carpenter v. United States*, 484 U.S. 19, 27 (1987) (rejecting claim that conduct did not violate criminal law because it "was no more than a violation of workplace rules"). That is amplified by the fact that the defendant's Motion cites only civil cases, binding choice-of-law in civil disputes, in support of his assertions. *Id.* at 16.

an indictment because the Executive has already done the balancing in deciding to bring the case in the first place.").

Although *Mannington Mills* provides for a "balancing process in determining whether extraterritorial jurisdiction should be exercised," it is typically applied in the context of a civil antitrust case—not a criminal violation.   D.I. 50, p. 16-19 (citing); *In re Vitamin C Antitrust Litig.*, 810 F. Supp. 2d 522, 542-43 (E.D.N.Y. 2011) (characterizing *Mannington Mills* as a test "in determining whether to assert extraterritorial jurisdiction in an antitrust suit").   As such, it is inapposite to this case.   Indeed, the government has only been able to locate one application of *Mannington Mills* in the criminal context, and there the district court noted that criminal cases are of "great importance to the United States," and found that it would be inappropriate to dismiss the indictment on those grounds.   *United States v. Brodie*, 174 F. Supp. 2d 294, 306 (E.D. Pa. 2001).

In any event, a brief analysis of the factors *Mannington Mills* demonstrates that "international comity" is not a basis to dismiss the Indictment in this case.

1. *Degree of Conflict with foreign law or policy.*   As the defendant notes throughout his Motion, Canadian law does not explicitly criminalize theft of trade secrets.   D.I. 50, p. 5, 10, 16, 18, 23.   But "[t]hat does not necessarily indicate a 'conflict,' however, as non-prohibition does not always mean affirmative approval."   *Timberlane Lumber Co. v. Bank of Am., N.T. & S.A.*, 549 F.2d 597, 615 (9th Cir. 1976).

2. *Nationality of Parties.* Chemours is an American corporation headquartered in Delaware.   The defendant is a Canadian citizen who, through his employment at Chemours, had regular contacts with colleagues and companies within the United States.

3. *Relative Importance of Violation.* "The fact that this is a criminal case indicates that it is of great importance to the United States."   *Brodie*, 174 F. Supp. 2d at 306.   As the *Brodie* court observed, the "threshold argument that international comity can never be a reason to dismiss an indictment because the Executive has already done the balancing in deciding to bring the case in the first place. . . . has force."   *Id*.   Here, the defendant systematically stole trade secrets to a business line worth hundreds of millions of dollars per year.   Such criminal activity is of more-than-relative import.

4. *Availability of Remedy Abroad.* "There is no remedy abroad[.]"   *Id*.   If the United States is barred from prosecuting, there is no trade secret law under which the Canadian Crown could prosecute the defendant.

5. *Intent to Harm or Affect American Commerce.* "This factor has little, if any, relevance to a non-antitrust case like this one."   *Id*.

6. *Possible Effect on Foreign Relations.* This trade secret prosecution has little risk of impacting foreign relations.   To the contrary, the United States and Canada worked in concert throughout this case under the 1985 Treaty with Canada on Mutual Legal Assistance in Criminal Matters ("MLAT"), and the Crown and Royal Canadian Mounted Police coordinated a search warrant execution on the defendant's home simultaneous to his arrest in New York.   Such cooperation reflects only positively on the relations between Canada and the United States.

7. *Conflicting Requirements*, 8. *Effectiveness of Order*, and 9. *Acceptability of a Similar Foreign Order*.   As in *Brodie*, "Factors 7, 8 and 9 do not fit easily within the criminal context because they relate to the impact of injunctions that ordinarily do not result from a criminal prosecution."   *Id.* at 306.

18

10. *Treaties.*   As noted above, a 1985 Treaty between the two countries explicitly allows for such cooperation and it was utilized here.

Thus, as in *Brodie*, "comity considerations do not counsel against hearing this case."   174 F. Supp. 2d at 306.   This claim should be denied, as well.


## CONCLUSION

For the foregoing reasons, the defendant's motion should be denied.


Respectfully submitted,

DAVID C. WEISS
UNITED STATES ATTORNEY

BY: */s/ Alexander S. Mackler*_____
Alexander S. Mackler
Jamie M. McCall
Assistant United States Attorneys


Dated:   March 19, 2018

19